Muenter v. Moline Plow Co., 193 Ill. App. 261.

---

### Carl Muenter, Appellee, v. Moline Plow Company, Appellant.

### Gen. No. 6,039.

1. APPEAL AND ERROR, § 800*—*when denial of motion to strike remand order from files reviewable.* Since the clerk of a Circuit Court has no power to certify into a common-law record the written reasons assigned for nor the proof heard on a motion to strike from the files a remanding order of the Appellate Court until the costs of both courts are paid, such matter, when not embodied in a bill of exceptions, will be stricken from the record by the Appellate Court on a subsequent appeal.

' See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Muenter v. Moline Plow Co., 193 Ill. App. 261.

2. APPEAL AND ERROR, § 990*—*when denial of a motion to strike remand order from files reviewable.* Where, on a motion to require the plaintiff to give security for costs, the defendant offered in evidence a motion and supporting affidavits and papers, filed at a former term, to strike from the files a remanding order from the Appellate Court, and which were afterwards incorporated in a bill of exceptions to the denial of the motion for security, the action of the trial court at the previous term, in denying the motion to strike, is not open to review thereunder.

3. COSTS, § 38*—*when motion for security to be made.* A motion made during the trial of an action, to require the plaintiff to give security for costs on the ground that the defendant just learned that the plaintiff had conveyed his homestead, which was incumbered, to his son by a voluntary deed, filed for record a week before the opening of the trial, for the alleged purpose of preventing the defendant from collecting the costs of a previous trial, *held* properly denied, where the defendant did not levy execution and have the homestead, which was worth more than the exemption, set off, since under the circumstances the motion should have been made before going to trial.

4. APPEAL AND ERROR, § 991*—*when refusal to permit juror to be questioned is error.* The refusal to permit certain questions to be put to veniremen, who were not accepted and who did not sit on the trial of a case, will not be reviewed, although the defeated party exhausted his peremptory challenges, where the abstract does not show that an unfair jury was put upon him or that he thereafter desired to and was denied the right to challenge other jurors.

5. APPEAL AND ERROR, § 1625*—*when exclusion of evidence cured by subsequent admission.* Where objections are improperly sustained to questions put to a witness on cross-examination, the error is cured where the answers sought were subsequently elicited before the cross-examination of the witness was completed.

6. WITNESSES, § 178*—*how witness interrogated as to testimony at former trial.* On a second trial of an action, a question put to a witness as to his testimony at the former trial *held* properly rejected, where the question embodied many questions and answers, some of which were in harmony with the witness' testimony given at the last trial, since the questions should have been separated.

7. EVIDENCE, § 52*—*when evidence of place of birth admissible.* It is not reversible error for the plaintiff on direct examination in an action against his employer for personal injuries, to state that he was born in Sweden, where he had been in this country for three years and his superiors thought it necessary to address him in Swedish, and it did not appear that any person of that nationality was a juror.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

8. TRIAL, § 73*—*when evidence in chief admissible on cross-examination of opposite party.* When the plaintiff is the first witness examined in an action against his employer for personal injuries, the defendant cannot on his cross-examination introduce in evidence a model, diagram or plan of the machine by which the injury was caused, nor can he suspend the cross-examination of the witness and introduce evidence in his own behalf to prove the correctness of such exhibits and then proceed with the cross-examination.

9. EVIDENCE, § 459*—*when evidence of witness at former trial may not be shown by bill of exceptions.* On the second trial of an action, the defendant cannot show the evidence of the plaintiff and his witnesses at the former trial by introducing a bill of exceptions in which such testimony was embodied.

10. MASTER AND SERVANT, § 605*—*when statements of employer's representatives admissible in action for injuries to employee.* Evidence as to what was said to a factory employee by his superiors, as representatives of their employer, is admissible in an action against the latter for personal injuries.

11. MASTER AND SERVANT, § 622*—*when evidence as to condition of machine after accident admissible.* Evidence as to the condition of a machine three days after an employee was injured by it is admissible in an action against his employer, where in the meantime the machine was operated but fifteen minutes immediately following the accident.

12. MASTER AND SERVANT, § 457*—*when duty of employee to inspect machinery for defects.* Where an unskilled employee working at a drop hammer was not required to give attention to mechanism located fifteen feet above the floor, other than to twice a day place oil in certain holes in the bearings, he was under no duty to inspect the mechanism for defects.

13. MASTER AND SERVANT, § 339*—*when employee assumes risk of nonrepair of machinery.* Where an unskilled employee working at a drop hammer was not required to give attention to mechanism fifteen feet above the floor, other than to put oil on the bearings twice a day, he does not assume the risk of injury from the nonrepair thereof.

14. MASTER AND SERVANT, § 709*—*when defective condition of machine question for jury.* Whether the overhead mechanism operating a drop hammer was left in an improper condition after repairing, and whether it was in that condition at the time of an employee's injury by the premature dropping of the hammer, is a question for the jury, where the device which sustained the hammer when not in operation was left in such a condition as to prevent it safely performing its necessary functions.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

15. MASTER AND SERVANT, § 711*—*when question for jury wheth-er master properly inspected machine.* Whether an employer prop-erly performed his duty in inspecting the overhead mechanism op-erating a drop hammer is a question for the jury, in an action by an employee for injuries sustained by a premature movement there-of, where such machine was repaired and the device which sus-tained the hammer when not in use was left in a defective con-dition so that the hammer frequently dropped when the machine was at rest.

16. MASTER AND SERVANT, § 751*—*when question of servant's due care in pushing iron through drop hammer for jury.* Whether an employee was in the exercise of due care when his hand was in-jured by the premature fall of a drop hammer is a question for the jury, where at the time he was reaching under the hammer 'in a manner commonly pursued, pushing a piece of iron into a cart on the opposite side of the machine, which was safe when the hammer was in proper repair.

17. DAMAGES, § 131*—*when judgment for injury to hand not ex-cessive.* A judgment for $5,763.61 is not excessive for the loss of three-fourths of the palm and all of the fingers except the index finger of an employee's right hand.

18. MASTER AND SERVANT, § 795*—*when requested instructions properly denied.* Requested instructions are properly denied in an action against an employer for injuries received by an employee, when they assume a state of facts not sustained by the evidence. or based on conflicting testimony, or when covered by the general charge given.

19. MASTER AND SERVANT, § 174*—*when following customary man-ner of work not negligence.* An instruction in an action for in-juries to an employee caused by the premature action of a drop hammer he was operating, to the effect that he could not recover if he was doing his work in an unnecessary manner, of which his employer was not aware, nor of which he could not have known by the exercise of ordinary care, was properly refused, where an assistant superintendent and several foremen in the defendant's employ were aware that the injured employee was doing his work in the manner commonly followed by other employees.

20. MASTER AND SERVANT, § 685*—*when verdict rendered for in-jured servant in absence of showing of defect responsible.* The jury may find for the plaintiff in an action for injuries sustained by an employee from the premature action of a drop hammer, al-though the evidence does not show the precise defect that caused the accident, where the declaration charges that the employer neg-ligently permitted the machine to become and remain out of re-pair and in a dangerous condition, to the plaintiff's injury.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

· 21. MASTER AND SERVANT, § 182*—*when violation of rule by injured employee no defense.* That an injury to an employee's hand, by the premature action of a drop hammer, was due to his violation of a rule of his employer prohibiting the pushing of pieces of iron through the hammer, is no defense to an action against the latter, where the continued violation of such rule was known to the assistant superintendent and several foremen in the defendant's employ, and the injured employee had been instructed to do as other employees did.

22. MASTER AND SERVANT, § 795*—*when requested instructions properly refused.* Requested instructions in an action by an employee for injuries to his hand, caused by the premature movement of a drop hammer, *held* properly refused.

23. MASTER AND SERVANT, § 799*—*when instructions in action for injury to hand proper.* The instructions given in an action for injuries to a hand of an employee by the premature action of a drop hammer, *held* to be correct.

Appeal from the Circuit Court of Rock Island county; the Hon. ROBERT W. OLMSTED, Judge, presiding. Heard in this court at the October term, 1914. Affirmed. Opinion filed March 9, 1915. *Certiorari* denied by Supreme Court (making opinion final).

SEARLE & MARSHALL, for appellant.

J. T. & S. R. KENWORTHY and ANDREW OLSON, for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

This case was considered by this court in *Muenter v. Moline Plow Co.*, 182 Ill. App. 578, and we refer to that opinion for a statement of the case. We reversed a former judgment and the cause was reinstated in the court below and tried by a jury and there was a verdict for plaintiff, a motion by defendant for a new trial denied, plaintiff had a judgment for the verdict and interest thereon and defendant appeals.

From the recitals in the record kept by the clerk it appears that the appellant in the court below moved to strike from the files the remanding order from this

*·See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

court and to strike the cause from the docket, and objected to the reinstatement of the case and moves that all proceedings be stayed until appellee paid the costs of the Circuit Court and of this court, and appellant filed certain affidavits in support of said motion; and the clerk also undertook to preserve another motion and the points filed in support thereof and certain affidavits. These were embodied in the record. Appellee moved to strike these matters from the record, specifying the pages thereof. Arguments for and against this motion were filed and we took it with the case. Counsel for each party assumed that a bill of exceptions as to those matters was presented to the trial judge and that some memorandum and his signature is attached thereto, appellee insisting that the meaning of the memorandum is that the judge refused to sign the bill of exceptions, and appellant insisting that this is a bill of exceptions signed by the judge.

We have diligently searched this record and find no such memorandum or signature by the judge. So far as we can ascertain, counsel are discussing something that is not in this record. Certainly at the pages which appellee has moved to strike from the record no such memorandum or signature appears. The papers copied into the record by the clerk, and which we are asked to strike from the record, do not have the form of a bill of exceptions. The clerk has no power to certify in a common-law record what written reasons were assigned for a motion nor what proof was heard upon the motion. This has been many times decided by courts of review in this State, recent cases being *People v. Ellsworth,* 261 Ill. 275, and *People ex rel. Edgar v. Board of Review Cook Co.,* 263 Ill. 326. The papers copied into the record by the clerk upon pages 16 to 23 inclusive and on pages 35 to 39 inclusive are therefore stricken from the record.

The trial began on January 12, 1914, and the hearing of proofs began on January 14th. On January 20th

appellant entered a motion to require appellee to give
security for costs, and to stay the suit until such se-
curity was furnished and until the costs of the Appel-
late Court were paid, and it filed certain points in
writing and offered in evidence certain affidavits and
the motion filed at the former term to strike the re-
manding order of this court from the files, etc., and
the affidavits and papers then filed in support thereof;
and thereby said motion and affidavit of said former
term were incorporated in this bill of exceptions.
They were proper for whatever bearing they had on
said motion of January 20, 1914, but their presence
at that point in the bill of exceptions does not furnish
any ground for reviewing the action of the court at
the previous term. The ground of the motion to stop
the progress of the cause until appellee gave security
for costs and paid the costs of this court at the former
term was that a few days before the present trial
began appellee conveyed his real estate to his son,
that appellant's representative did not learn thereof
until three days before the motion was made, and that
the day before the motion was made said representa-
tive learned from said son that he paid no money
consideration for said deed, but said son refused to
state what the consideration was, and referred him to
appellee therefor, and appellee refused to make any
statement of the matter; and said representative al-
leged that he was informed that appellee had no other
property from which the costs could be collected, and
that he believed that the deed was made for the pur-
pose of preventing any collection of the costs of this
case from appellee. The affiant also stated that the
property so conveyed was the homestead of appellee,
and was subject to a mortgage for $1,000, and that he
believed it was worth $3,000. Appellant also offered,
upon said motion, the execution against appellee for
costs, amounting to $319.66, which issued from this
court since the former hearing here, and showed that

it reached the sheriff of Rock Island county on October 30, 1913. If appellant believed that there was any value in said property above the homestead and the mortgage, why did it not levy said execution upon said real estate and take proceedings to have the homestead set off and the property sold under said execution? This deed was filed for record three days before the trial of this case began. The affiant says he is an agent of appellant, and did not know of the filing of this deed until January 17th, a week after the trial began. But there is nothing to show that the attorneys for appellant or the officers of appellant did not know of this deed at the time it was recorded, and if they did, then they should have made this application before this trial began. Appellant does not show that it could not have made this application before the trial began. Again, said affiant only surmises or guesses that the purpose was to prevent appellant from collecting its costs. If the court had deemed an application of this kind, in the middle of a long trial, sufficient, it would have been bound to enter into an inquiry as to what the purpose was in making the deed, and it might very well be that it was made to enable appellee to provide a way for raising funds to procure the services of attorneys for this third trial of the case, or to procure the attendance of his witness Pearson from South Dakota, and for other expenses of the trial. As appellant could have subjected said property to sale under its execution and did not, and as it has no judgment for the costs of the Circuit Court, but on the contrary the judgment for said costs is against it, and as the granting of such a motion ten days after the trial began is not supported by any authority to which our attention is called, and would be a rule very demoralizing to the trial of causes, we approve the action of the trial court in exercising its discretion in refusing to suspend the trial at that stage of the case.

Appellant asked certain questions of various members of the panel during the selection of the jury, to which the court sustained objections, and it is argued that the questions were proper and that the court erred in not permitting them to be answered. None of those jurymen were accepted, or sat in the trial of the case. Appellant exhausted its peremptory challenges, but the abstract does not show that it thereafter desired to challenge any other juror and was refused or that an unfair juror was put upon it, and the abstract therefore does not show that if the questions were proper, appellant was harmed by the refusal to permit them to be answered. The rule laid down in *Spies v. People,* 122 Ill. 1, on pp. 257, 258, and in *Graff v. People,* 208 Ill. 312, and followed in various Appellate Court cases, is that unless it appears that an objectionable juror was put upon the defeated party after he had exhausted his peremptory challenges, rulings of the court in regard to jurors who were not accepted will not be considered. In *Grand Lodge I. O. M. A. v. Wieting,* 168 Ill. 408, this rule was applied to alleged errors of the trial court in refusing to permit appellant to put certain questions to certain veniremen, and as an unobjectionable jury was obtained, the Supreme Court declined to consider whether the trial court did or did not rule correctly. Appellant has embodied in the record the entire examination of jurors, covering about 135 pages, but it is not our duty to examine more of that record than has been abstracted to see if we cannot discover some error. *Inman v. Miller,* 234 Ill. 356; *Phillips v. Benfield,* 249 Ill. 139; *Stout v. Taylor,* 168 Ill. App. 410; *Biggs v. Peoria & P. U. Ry. Co.,* 182 Ill. App. 613. The abstract does not show reversible error in that respect.

Many errors are assigned, but, as they are summarized in appellant's brief, those not already considered are confined to rulings on the evidence and the

instructions. The record is full of objections to questions put to the witnesses. Upon a careful examination we find that in very many cases where the court sustained an objection to a question put by appellant in the cross-examination where the ruling seems wrong or doubtful, it appears that before the cross-examination was finished the evidence sought was obtained and thereby a possible error was cured. There are instances where an objection was sustained to a question put by appellant to appellee whether he did not make a certain answer on a former trial, but before the cross-examination was finished the witness stated that he did make that answer at the former trial. Appellee was asked on cross-examination if he had looked over his former testimony and an objection was sustained to that question, but before the cross-examination was finished appellee answered that he had not read his former testimony but that he had talked it over with his attorney. The truth seems to be that appellant's counsel was persistent, and when he had put what he conceived to be a proper cross-examination and an objection thereto was sustained, he did not rest upon the supposed error of that ruling but went after the matter again and again and generally obtained a complete answer to his inquiry before the cross-examination was finished. Appellant read to the witness Pearson in the cross-examination, in one interrogatory, a large number of questions and answers, and then asked him if such questions were put to him and if he made such answers at the former trial. One such interrogatory also embraced the question whether, at the first trial, he had been asked certain questions and made certain answers. Objections were sustained to these questions. Appellant's counsel stated to the trial judge that if the objection was that he was combining several questions and answers in one question, he would put them separately. The court indicated that he thought that form was ob-

jectionable, but that he was ruling on other grounds. The questions should have been separated, because very many of the supposed answers were entirely in harmony with what the witness had already testified to both in direct and cross-examination, and such answers contained no matter of impeachment or contradiction. Unquestionably if any witness has given an answer in a material matter at a former trial not in harmony with his testimony on the present trial, the cross-examiner has a right to ask the witness if he did so state on the former trial. In fact there was substantially nothing of importance in the matter supposed to have been testified to by him in the former trial but what had already been stated by him on his cross-examination at this trial. Pearson was a machinist who assisted a representative of appellant in repairing the overhead mechanical appliances of this drop hammer in August preceding this injury. The object of these omnibus cross-questions was to show that at the former trial he had testified that when that repair was completed in August the parts were put back in their proper places, and were in order, and were tested by him and found to be in order. He had previously testified on the cross-examination at great length that these appliances were in proper order when the machine was reassembled after the repairs in August, and that they tested it then, and that it worked perfectly. Therefore these supposed omnibus questions contained substantially nothing to contradict the evidence of the witness. But more than all that, the thing sought to be established by Pearson's direct examination was that the stopper bar was bent when the repairs were finished, and that the dog engaged the stopper bar only about three-quarters of an inch. Bruce, one of the representatives of appellant, and under whose direction said repairs were made in August, testified for appellant that the stopper bar was bent and crooked, and was left by him in that condi-

tion purposely, and that he regarded that as the proper condition for it to be in; and either he or another witness for appellant testified that the dog only engaged the stopper bar about three-quarters of an inch, and that it ought not to engage it any more than that. Therefore the fact that the stopper bar was left bent and crooked and engaging the dog only three-quarters of an inch was proved by appellant, and therefore if there was anything in Pearson's former examination tending to the same effect which would have contradicted anything he testified to on this trial, still appellant was not harmed by not obtaining it, because it claimed the truth was as Bruce testified, and the question then became, not whether the stopper bar was in fact crooked and bent and engaging the dog only three-quarters of an inch as appellee's testimony tended to show, but whether that was a proper and safe condition as appellant claimed or was dangerous and calculated to permit the machine to repeat as appellee claimed. Appellee on cross-examination was asked similar questions, though they were not combined to the same extent in one interrogatory. The observations above made concerning Pearson's cross-examination apply in part to that of appellee, and in addition, before the cross-examination was completed, appellee had answered most of the questions. When the whole record is considered, we do not find any reversible error in those rulings. Appellee was asked on direct examination where he was born, and answered "In Sweden." It is earnestly insisted both in the original and in the reply brief that this was reversible error. Appellant proved by some of its foremen that they gave orders and directions to appellee in the Swedish language. The fact was that he had been in this country but a little over three years when he was injured and that his superiors thought it necessary to address him in that language to make him understand, and it is evident that at this trial it

was difficult to make him understand some of the questions in English. The names of the jurors are not contained in the abstract nor does the abstract show that any man of Swedish nationality sat upon the trial. We find no error in this respect.

In cross-examination of appellee, who was the first witness at the trial, appellant sought to put in evidence various models, diagrams and plans of the machine upon which appellee was working when he was injured, including parts thereof which were not in his sight when he was at work and with which he was obviously unfamiliar, and then to cross-examine appellee upon these models and diagrams. Appellant also proposed to have appellee withdrawn from the stand, and to call a witness for appellant and prove by him the correctness of these models, diagrams and plans, before proceeding with the cross-examination of appellee. Our attention is not called to any case where it has been announced as a proper rule of practice for a defendant to begin introducing his testimony before the completion of the examination of the first witness for the plaintiff, and undoubtedly such a rule of practice would be extremely confusing. Appellant had no such right. Appellee was not an expert and it was not proper for appellant to introduce its evidence at the very commencement of appellee's case, and we approve the ruling. In due time appellant in its proper order was permitted to introduce these models and diagrams and had all it was entitled to in that respect. If appellee had been testifying as an expert as to the construction of this machine and as to the respect in which it was faulty, probably appellant might properly have cross-examined him with the aid of a model not yet in evidence.

In making its case appellant offered in evidence the testimony of appellee and other witnesses at the former trial from the bill of exceptions. It did not produce the stenographer who took the evidence and

prepared the bill of exceptions to swear to its truth-
fulness, but showed that it was inconvenient for it to
produce said stenographer. The bill of exceptions
was not signed by the judge who tried the case, for
he was then dead, and it was signed by another judge
of that circuit. The bill of exceptions was not compe-
tent for this purpose, as held in *Kankakee & S. R. Co.
v. Horan,* 131 Ill. 288, and *Illinois Cent. R. Co. v. Ash-
line,* 171 Ill. 313, and cases there cited. One obvious
reason is because the witness had no part in making
up the bill of exceptions and no opportunity to decide
whether it was correct or incorrect before it was
signed. The parties to the suit may have considered
his evidence unimportant and may have paid no at-
tention to its correctness, or they may have been will-
ing to have some parts omitted or abbreviated. The
rule, of course, is entirely different if any witness has
testified to the correctness of· the report of the evi-
dence of the witness as therein set out.

Complaint is made of the admission of testimony of
what certain men said to appellee in the shop. These
men were either assistant superintendent, machinist,
or one of the foremen of the shop, and all of them ap-
pellee's superiors and all of them representatives of
appellant, and what they said to appellee was said by
appellant and was therefore competent evidence. It
is urged that it was error to permit appellee to prove
the condition of the machine after he was hurt. When
appellee was hurt he was immediately removed to a
hospital. He had a few irons in his furnace, heated
and ready to be put through the machine. Bruce, as-
sistant superintendent, came immediately and ran the
machine about fifteen minutes to work off the irons
in the furnace. He testified the machine did not re-
peat during that time. The proof is positive and un-
contradicted that the machine then remained idle for
three days. Under these circumstances we think it

not erroneous to prove the condition of the machine at the close of said three days.

The machine in question was known as a drop-hammer machine. There was an anvil in front of the operator and a hammer weighing perhaps eight hundred pounds which stood raised about two feet above the anvil. In the face of the hammer and in the face of the anvil, dies were inserted, according to the work to be done. These dies weighed about one hundred and fifty pounds. The operator inserted the dies and cleaned them when necessary. Some distance above the head of the operator was a frame work. Attached to the hammer was a rope which went to a mechanism some fifteen feet above the floor. Among the mechanisms at that distance from the floor was a stopper arm, which was connected with the shafts which operated the machinery in various parts of the plant. There were also two devices called stopper bars set horizontally. There was also a dog which engaged the front stopper bar, and while this mechanism was in that position the hammer was held suspended. Another mechanism connected with a pedal near the floor enabled the operator to remove the dog and release the stopper bar and the hammer then fell. When the foot of the operator was not upon the pedal the hammer remained suspended above the anvil, if the mechanism was in proper condition. The operator of this particular machine faced west. There was a north and south aisle in the shop, directly back of his machine. To the right of the operator and a little further east was the furnace wherein his irons were heated by the helper. Immediately north of the furnace was an east and west aisle. The operator handled the heated irons with a pair of tongs and used both hands in doing so, the right being nearest to the irons. It was his duty to place the heated iron on the anvil, cause the hammer to drop twice upon it, and permit the hammer to be immediately raised, and he then with his tongs put

the iron into a cart provided for that purpose. There were two places where the cart could stand. If the cart was north of the anvil and immediately west of his furnace, he drew the iron towards him and then to the right into the cart. If the cart stood in the aisle immediately west of the anvil, he pushed the iron from him and dropped it into the cart. Appellee was hurt on October 11, 1906. This mechanism, fifteen feet above the floor, had been out of repair in the previous August and portions thereof had been taken down by machinists and repaired in some other part of the shop and returned some days later, and appellee again set to work upon the machine. Appellee contends that these appliances were not then properly repaired but were reassembled when they were in an improper condition and unsafe, and that this was negligence, and also that the machine had repeated a few days before he was hurt. Appellant contends that it was not negligent in this respect; that if the machine afterwards became out of repair, it was the duty of appellee to know that fact and to report it, and that he did not do so; that appellee was negligent in not ascertaining if the appliances were out of repair; and negligent in pushing the iron over the anvil into the cart, when it was an absolutely safe way for him to have his cart north of the anvil and pull the iron out from under the hammer and deposit it in the cart to his right; that appellee had been expressly ordered not to push the irons through and have his cart behind the anvil, and that he disobeyed these orders and was thereby hurt; and that he assumed the risk of working with the machine as it was and also the risk arising from his disobedience of orders. There was proof that when the appliances high above the floor were reassembled after the repairs in August, the stopper bar was bent when it should have been straight; that the dog was worn and the ends of the stopper bar were rounded instead of square, thus making it easier

for the dog to slip off; and also that the dog engaged the stopper bar only three-quarters of an inch when it should have engaged it from an inch and one-quarter to an inch and one-half, and that these conditions would tend to permit the hammer to fall when the pedal was not pressed. There was proof that when an operator started to again work with the machine three days after appellee was hurt, the hammer repeated again and again, and it was found that the stopper bar was still more bent and the ends thereof still more worn, so that the dog would not hold up the hammer. All these matters were contradicted by evidence introduced by appellant. There was evidence that it was the general duty of each operator upon the various drop hammers in that shop to be responsible for his own machine, and to ascertain and report whenever it was out of repair. We are satisfied from all the evidence that though that was true as to the hammer and anvil and conditions where the operator stood, it was not true as to the mechanism fifteen feet above the floor and here involved. Underneath this mechanism and the platform there were timbers, and beneath these was a metal pan to catch oil which might drip from those bearings and the dust. It was the duty of appellee to go up to this place twice a day and pour some oil through three or four oil holes in the bearings. He had no other duty to perform above that drip pan. From where he stood when operating the machine he could not see this mechanism at all if he tried to look. He was not a machinist in the ordinary sense. He was really an unskilled workman. It does not appear that he had any knowledge of the exact condition of the appliances involving the stopper arm, the stopper bars, the dog and a certain spiral spring and certain rubber bands, or their connection with the shaft. His only duty above the drip pan was to go there twice a day and put oil in the oil holes. We are

of opinion that he had no duty of inspection of those appliances, had no means of knowing whether they were or were not in order, except by the fact of the hammer repeating, while appellant owed him the duty of inspection of these appliances and owed him the duty to exercise reasonable care to furnish him a reasonably safe place in which to work, and therefore that there is no evidence in the case from which the jury could be permitted to find that he assumed the risk that these appliances were in good repair. The assistant superintendent or head machinist and various foremen in that shop testified that they forbid appellee to place his cart back of his anvil and to push the irons through the anvil into the cart and to put his hand under the hammer, but directed him to put the cart at the right of the anvil and to pull out the irons towards himself and deposit them in the cart to his right. Appellee when hurt had the cart back of the anvil and was pushing the irons through the anvil with his tongs. Neither he nor any other witness could tell exactly how his hand came to be under the hammer when it repeated. Appellee denied these orders and directions, except as to two instances. He testified that on one occasion one of the foremen told him to move his cart from the rear of his anvil to the side because the foreman wanted to use that aisle at that time for a certain purpose connected with certain beams, and that he accordingly did so move his cart until the foreman was through using the aisle, and then he put it back behind the anvil again. Appellee testified that it was sometimes necessary for him to clean the die on the face of the anvil and that for this purpose he was supplied with certain appliances, including a brush and a hose, and that on a certain occasion the hose was out of order and he was obliged to use the brush alone to clean the die, and that brought his hand under the hammer, and that a foreman, who came along, asked him why he did it that

way and appellee told him the hose was out of order, and the foreman then told him, that when he had occasion to put his hand upon the die in that way he should first put a certain wooden block upon the anvil, which would protect his hand if the hammer fell. While some of the witnesses for appellant testified that it was improper to push the irons through the anvil, other witnesses for appellant plainly showed that it was not unsafe to do so, especially with the shorter irons, and that it was common practice in that shop. Appellee testified that when he was taken from the position of helper and made an operator of a drop-hammer machine, ten months or a year before he was injured, he expressed to the foreman doubt of his ability to do the work and that his foreman told him to do as the other operators did. The drop-hammer operator under whom appellee worked as a helper before he was put upon this drop hammer testified for appellant that while appellee worked as his helper, the witness was in the habit of pushing "Dutch Uncle" shanks through the machine and dropping them into a cart back of it instead of pulling them towards himself, whenever it was more convenient to do it that way, and that that was a safe and proper method. It is plain from an examination of all the testimony offered by appellant that while some of its foremen declared that method of removing the iron from the die to be improper, yet that was a very common practice in that shop with its seven or eight or nine drop hammers, when working upon "Dutch Uncle" shanks and other short irons, prior to the injury to appellee, and that the foreman saw the business so conducted, and never claimed to have tried to stop the practice or to give any other or different orders, except the contrary orders which they claimed they occasionally gave to appellee. Witnesses for appellant testified that the iron could be pushed through the anvil without putting the hand of the operator upon the place where the

hammer would fall. When appellee was hurt he was working upon "Dutch Uncle" shanks, short small irons which some witnesses for appellant said it was proper to shove through the machine. Appellee testified that he did this work in this way because he could work more rapidly to shove the iron from him and to let it fall into the cart than to pull it towards him and then push it to the right, and that he was paid so much for each one hundred irons that he put through his machine. A witness for appellant gave testimony indicating his suspicion that appellee's foot may have touched the pedal and thus released the hammer at this time, but appellee positively testified that he did not touch the pedal, and the fact that the machine constantly* repeated when operation was resumed upon it after three days tends to indicate that it did repeat without the operation of the pedal when appellee was hurt. There therefore was evidence tending to show that the overhead appliances were left in improper condition when reassembled in August, and that they were in an improper condition when appellee was hurt, and that appellee was injured because thereof, and that appellant had not properly performed its duty of inspection, and that appellee was in the exercise of due care, and these were questions of fact for a jury. There have been three trials. The result of the first we do not know. The second and third verdicts were for the plaintiff. We conclude that a verdict either way upon these questions of fact should not now be disturbed by this court. Plaintiff lost three-fourths of the palm of his right hand and all the fingers thereof except the index finger. The judgment for $5,763.61 is not excessive.

Appellant criticises several of the instructions given at the request of appellee, but we conclude such criticisms are not well founded. Appellant requested forty-six instructions. The questions of law involved in the case were few and simple, and we regard a re-

quest for so many instructions as an abuse and as casting upon the trial judge an unnecessary burden. This multiplicity of instructions was created by stating the legal propositions supposed to be applicable to the case in many different ways and stating two or more legal propositions in many different combinations, calculated to puzzle the trial judge. The court gave twenty-eight instructions requested by appellant and refused eighteen. No. 1, refused, assumes that appellant had given appellee positive and express instructions as to the manner of doing his work, whereas the evidence made that a disputed question. The other provisions of said instruction are embodied in instructions given for appellant. No. 2, refused, is practically embodied in the given instructions. No. 3, refused, is to the effect that if appellee was doing his work in an unnecessary way and was injured in direct consequence of so doing it, and if defendant did not know that he was so doing the work and could not have so known by the exercise of reasonable care, then appellee could not recover. There was no proof upon which to base this instruction. Not only had the assistant superintendent or head machinist and several foremen seen appellee doing this work in the way he was doing it when he was hurt, and so testified, but one of them testified that he knew that appellee sometimes did the work in that way and saw him so doing it on the Saturday before the Wednesday on which he was hurt. Knowledge by the foreman was knowledge by appellant, and as such knowledge was clearly established and not denied, this instruction was properly refused. No. 4, refused, put upon appellee an assumption of risk much greater than the evidence would justify. Instructions Nos. 18, 25 and 26, given at appellant's request, stated the law on that subject sufficiently, as shown by what we have heretofore said of the evidence bearing upon the assumption of risk. No. 5, refused, ignored appellant's duty of inspection

after the overhead appliances were repaired in August. Instruction No. 22, given, was sufficient on that subject. Two of the propositions embraced in No. 6, refused, were embodied in given instructions No. 4 and 14. The remaining proposition was that the jury should find for defendant if they were unable to decide from the evidence the nature of the defect in the machine. The declaration is improperly abstracted, but an examination of the record shows that one count thereof contained the general charge that defendant negligently permitted the machine to become and remain out of repair and in a dangerous condition and thereby plaintiff was injured. Under that charge it was not necessary for the jury to determine the exact nature of the defect in order to find for plaintiff, and that part of the instruction was calculated to mislead the jury. No. 7, refused, was covered by given instructions Nos. 4, 5, 14 and others. No. 8, refused, was covered by given instructions Nos. 6, 16, 17, 18, 19, 20, 21, 23, 24 and others. We are of opinion that the evidence does not show such a duty in appellee to inspect the overhead appliances controlling the action of the hammer as appellant has assumed in refused instructions Nos. 9, 10 and 11, and that given instructions Nos. 18, 25 and 26 and others stated all that appellant was entitled to on that subject. There is no evidence that appellee had any such knowledge of the defects of said overhead appliances as to justify refused instruction No. 12. Nos. 13, 14 and 17, refused, were to the general effect that if appellee disobeyed an order of his superior and was injured in consequence thereof, he could not recover. There was proof of several such orders at different times by different foremen and these orders were not always identical. The instructions do not designate which order was meant. They covered those given long before the injury as well as the more recent. There were a number of drop-hammer machines operating in that

shop, either seven, eight or nine. Witnesses introduced by appellant gave evidence tending to show a custom or habit or practice in that shop that operators of these machines pushed the irors through the machine just as appellee was doing when he was hurt, and especially that they did so when working on short pieces of irons, as these "Dutch Uncle" shanks were. With an assistant superintendent or head machinist and several foremen in this shop all the time, the evidence warranted the jury in finding that these violations of this order were habitual when working on short irons, and were well known to appellant through its foremen and superior officers and were permitted to continue. Perhaps this practice was not stopped by appellant because under the proof each man could accomplish more work by pushing the short irons through the machine. Only half as. many movements were required by the operator to push the iron through as to draw it back and cast it to the right. We held in *Coburn v. Moline, E. M. & W. Ry. Co.,* 149 Ill. App. 132; *Kenny v. Marquette Cement Mfg. Co.,* 149 Ill. App. 173; and *Bertelsen v. Rock Island Plow Co.,* 164 Ill. App. 459, that abrogation of a rule may be shown by proof of its habitual violation with the knowledge of the master who established it, and that such knowledge will be presumed if the violation continues so long that the master might reasonably know it. The *Kenny* case, *supra,* was afterwards affirmed in 243 Ill. 396, where other cases are cited. This principle would apply to the supposed orders given appellee here, especially in view of the fact that the proof shows that he was directed to do this work as the operators of other drop-hammer machines did theirs. This instruction ignored points which must be considered in determining whether a failure to obey the order referred to in said instructions necessarily defeated appellee in this suit. No. 15, refused, ignored the effect of the proof that if the overhead appliances were

in proper condition and the appellee's foot was not upon the pedal, it was safe to put one's hand upon the plate. It also ignored the rule laid down in *United States Wind Engine & Pump Co. v. Butcher*, 223 Ill. 638, and *Clark v. Chicago, R. I. & P. Ry. Co.*, 231 Ill. 548. No. 16 was properly refused because there was no proof that the failure of appellant to repair was due to the negligence of any one who could be found by the jury to be a fellow-servant of appellee. No. 18, refused, was covered by several given instructions, requiring due care of plaintiff as a prerequisite to his recovery, and especially by given instructions Nos. 21, 24 and 26. Our reference here to "given instructions" are to those given at the request of appellant.

We find no reversible error in the other matters of which complaint is made. The judgment is therefore affirmed.

*Affirmed.*